Investments, Inc. Arguments not to exceed 15 minutes per side. Mr. Rogers for the appellant. Mr. Rogers for the appellant. My name is Greg Rogers. I represent U.S. Bancorp Investments, Incorporated. I'd like to reserve three minutes for rebuttal, please. This is a Sarbanes-Oxley whistleblower retaliation case, one of the very first jury trials of one of these cases. The Dodd-Frank amendments to Sarbanes-Oxley allowed plaintiffs to have jury trials. The claim is that the U.S. Bancorp Financial Advisor recommended an unsuitable investment to a client of the firm, and that because of the complaint by the plaintiff that he was fired. We believe that the district court judge should have entered judgment as a matter of law for U.S. B.I. because the plaintiff did not show any material misstatement to the client by the firm. There was a series of meetings between the other financial advisor and the client that the plaintiff was not privy to. When he made his complaint by email on May the 24th of 2009, he had not spoken to the client. He had not spoken to the other financial advisor. Wait a minute. The plaintiff is saying that there were imprudent investments made. Correct. So you're saying he has to have a factual basis for that statement in order for it to be protected? He has to have a reasonable belief that there was a material misstatement by a member of the firm. Reasonable belief. Okay. Why didn't he have a reasonable belief? Because he did not speak with the client. He did not speak with the other financial advisor. Well, this was a rather unusual client. I would agree. He was elderly, and he was maybe not altogether in his right mind. Well, ma'am, your honor, the plaintiff left work on October the 30th of 2009. That was the day he placed the only trade he placed for this gentleman in question. The only trade he made was the last day of work. The plaintiff did not speak with this gentleman again. But didn't he have an understanding that the investment plan was that he wouldn't be actively trading for this client? So it's not unusual that he didn't have a bunch of trades there. In fact, he had just begun to. I mean, it was the first trade because he hadn't been trading. It was all in a trust. Well, the two investments that were made were other assets that had not been part of the trust that had matured. And the client wanted to do something with those monies, almost a million dollars, and get something beyond passbook interest. So the plaintiff is on leave of absence, and he comes to the bank wanting to make a trade or trades. And that's how he gets connected with this other financial advisor. But aren't these fact questions for the jury? No, because the question is material misstatement. There is no question that there was no material misstatement by the financial advisor to the client. The investments that were recommended made this gentleman more money than the investment that the plaintiff says should have been made. Let me ask you this. Were the jury instructions to the jury as to what constitutes material misstatement, were those legally correct such that the jury had the legal framework available to them that they would use to resolve these factual disputes? I would submit no. I would submit that the plaintiff submitted one set of instructions based on the plaintiff's belief of what the law was. So we submitted a different one than that the judge punted. We adopted neither. Well, what instructions were given by the judge on material misstatements that were legally incorrect? I don't know if that's the issue you reserved for appeal or not without looking at your brief again, but what material, what round-fold legal instruction was given on material misstatement? We did not raise as an issue of error the jury instructions. He did not follow the Sixth Circuit standard in the Riddle case about what's necessary for a plaintiff to prove, a reasonable belief about a material misstatement. And the reason I didn't raise it is because I don't believe that under any set of circumstances that there's any material misstatement here. But if you didn't object to the district judge's jury instructions, aren't you at a big disadvantage to objecting now? A, I did object. B, it doesn't make any difference because there's still no material misstatement under any standard. You objected. You just didn't raise that on appeal. Is that what you're saying? Yes, sir. The plaintiff wasn't there for the conversation, doesn't know what was said. The only trade that the plaintiff placed for the client was his last day of work. He did not speak with the client again. He did not speak with the other financial advisor. He doesn't know what the client's desires were, doesn't know where the money came from, and doesn't know what the financial advisor told the client. Of course, he provided plenty of testimony that he knew all about what the client wanted done because he had spent years counseling and talking to the client. That's correct. And the jury was entitled to believe that if they chose to do so. The financial advisor testified that there were new facts and circumstances since the time of plaintiff's last day of employment.  We don't know whether one of those gentlemen is appearing very reliable on the stand or very credible on the stand. But that testimony was undisputed from the other financial advisor, Mr. Harrigan, about the conversations that the client had with him. The plaintiff assumed the worst but did not know what the client's desires were, didn't know what the source of funds were, didn't know why the client was investing, didn't know how the client wanted the funds to be titled. The other financial advisor knew all those things. The other financial advisor, the plaintiff, this is a simple workplace dispute between clients or between financial advisors. This is not a violation of the Sarbanes-Oxley Act. So why is the plaintiff fired then? He submits because of the complaint that he made. We submitted that because of his poor production. Obviously, the jury believed, filed for the plaintiff. So in this posture, we are left with assuming the jury was correct, that he was fired because he made this complaint. So at one point you said that the standard was the reasonable belief standard. Is that what your position is? Yes, Judge, the Riddle case out of this court. Riddle is an unpublished case, as I recall. Is there a published case that you would rely on? I do not believe that there is, Your Honor. Our position is very simple, that there was no material misstatement made, that the plaintiff did not speak with either of the principles in question, that the circumstances had changed since the plaintiff had left on his leave of absence concerning the client and his desires, that the trade was a suitable trade. Indeed, the undisputed evidence is that the client was better off with the investment advice made by this other financial advisor. The plaintiff wants to make this complaint about... The plaintiff could have a proper claim for retaliatory termination, even if he was wrong in his belief that it was an unsuitable trade, right? As long as he had a reasonable belief it was an unsuitable trade. I would submit that's correct, Your Honor. Again, this is not just a generic Title VII whistleblowing complaint. This is Sarbanes-Oxley. It has to rise to the level of securities fraud, a 10B claim. This is, again, different than just a run-of-the-mill retaliation claim, securities fraud. He's got to meet certain elements, and he's got to have a reasonable belief that... without being able to secede on a 10B claim, right? I would say you're right, but I would say that the elements are very similar. He's got to have a reasonable belief that a 10B violation occurred. That's essentially what the allegation is. You can't just go accusing a coworker of violating the securities laws without knowing any of the facts and circumstances relevant to the trades in question, and that's exactly what happened here. Again, trying to think about this in a more simple situation. Hypothetically, you could have somebody who represented a client for a long period of time and knew intimately that client's needs and then is out for medical reasons and sees that something really horrendous is done to that client's portfolio and sends an email saying, I'm really sick with my illness, but I see that this massive wrong was done to my client. And if that hypothetical person were fired immediately, that could be the basis for Sarbanes-Oxley whistleblower claim, right? Your Honor, my experience... I'm simplifying the case, trying to get away from the details that you want me to look at. Well, in my experience, things are not as simple as you posit. If under all the facts and circumstances that belief was reasonable, then I would agree with you, yes. But the facts and circumstances obviously are important in any of these situations. And you're saying as a matter of law, because you want us to say judgment as a matter of law is proper, you're saying as a matter of law, based on the actual facts that were presented to the jury, it could not have been a reasonable belief on this plaintiff's part. That's right, Your Honor. I would submit that the jury found that he was fired for making his complaint, and that's why they ruled why they did. That's not enough. The complaint has to rise to a violation of the securities laws. It's a Sarbanes-Oxley complaint. And we submit that that's where the evidence fell down, that there wasn't sufficient evidence to show that the plaintiff had a reasonable belief that securities fraud was committed by the firm and that that's what his email complaint was all about. I'll cede the floor and be happy to answer more questions in a moment. Thank you. May it please the Court, Counsel, I'm Lynn Punzack. I'm here today on behalf of Mike Reinheimer, the appellee in this matter. Let me start by addressing a question that I think everyone on the panel touched on, and that is the reasonable belief standard and exactly what it means in this case. Every court of appeals that has published an opinion on SOX to this point has indicated in its opinion that SOX protects a whistleblower's reasonable but mistaken belief that conduct constituted a securities violation. I cited those cases in my brief, but they are the Welsh case, the Day case, and the Fifth Circuit case in Allen. But, of course, there has to be, it's entitled reasonable belief. So, given your statement, it protects reasonable but mistaken. It can't be a grossly mistaken. I'm making up the word grossly there, but some really, really bad mistake. If you are totally, totally wrong and any reasonable person would know that you're wrong, that would not be protected. I think that's clear from the statute's language. If it's such a gross mistake, it cannot possibly be reasonable. But I think what the defendant is doing here is it's asking for a very specific type of reading of the statute. It's arguing for a very restrictive view of SOX. They're insisting almost on direct evidence on every element of an unsuitability claim that's underlying Mr. Reinheimer's SOX retaliation claim. And that's simply far beyond the scope of virtually any kind of case that I'm aware of under SOX. Circumstantial evidence can support even murder convictions, much less civil jury verdicts. But given the SOX case law that indicates that whistleblowers' reasonable but mistaken beliefs are protected, I don't think there's any doubt but that Mike Reinheimer's belief here supports his SOX claim. Let's talk for a moment about what Mike Reinheimer believed on May 28, 2010, when he wrote the complaining email about the trades that were made for this 94-year-old investor of diminished capacity. What he knew was that after 10 years of working with this gentleman, this man had no interest in playing the market. This man had all of his assets in trust except for a very small portion of them that had been carved out by Mr. Reinheimer after that 10 years of discussion. That's all that was out of the trust, and the $900,000 that were pulled, those dollars that were pulled by Mr. Harrigan and put in the brokerage account, which was not a trust asset now, those $900,000 were in trust. They were there for the benefit of the charitable beneficiaries and the educational beneficiaries that Mr. Purcell was hoping to leave the bulk of his estate to. So Mr. Reinheimer knew this about Mr. Purcell, and Mr. Reinheimer told Patrick Harrigan about this before Mr. Harrigan placed these trades. So Mr. Harrigan then was informed about this longstanding estate plan, and Mr. Harrigan made the agreement that Judge Clay referenced that he would not place trades for Purcell. So at the time he wrote his email, he knew that Purcell... Just so I'm clear, when these trades get made, the financial advisor gets a commission? Yes. The bank or investment gets something out of it too? Yes. Okay. Now your opponent's theory is that things had changed and that your client should have investigated before sending the email. Mm-hmm. Mike Reinheimer had a reasonable belief at the time he went off on leave that he knew Mr. Purcell's investment plan. He spoke with Harrigan in April. Mr. Harrigan never told him there's been a change. Mr. Purcell is trying to come in here and make new trades. Nothing ever came to Mike Reinheimer's attention on this matter. Mike's belief as to his estate plan was based on 10 years of experience. I think that makes it reasonable for him to believe he had an idea of this man's plans for his estate after his death. I think it's also important to note here, Judge, that when he made the purchase for Purcell, the $900,000 worth of two funds, Harrigan did not know that Purcell's assets, including the account from which the $900,000 was taken, was held in trust. His own emails show that he learned about the trust only after he placed those trades. So essentially what USBI is asking this court to do is to find as a matter of law that Reinheimer's accurate beliefs were not reasonable because Reinheimer believed that Mr. Harrigan could not have told Mr. Purcell everything Mr. Purcell needed to know about the damage that these trades would do to his trust. This is an omission rather than a deliberate misstatement. His belief was that he omitted this information when he was having these conversations with Purcell. He wasn't in the room, but he believed that because of Mr. Purcell's mental state, Mr. Purcell couldn't understand this, and that Mr. Purcell, if he could understand it, would never have destroyed 10 years' worth of plans. So this is the basis of Mr. Reinheimer's reasonable belief, and it's borne out because at trial the jury saw these emails from Mr. Harrigan showing that Mr. Reinheimer's belief was indeed reasonable. It was reasonable because it was accurate, and USBI can't show that his beliefs were not reasonable when the evidence shows that they were accurate. With respect to the change that allegedly occurred to Mr. Purcell's estate plans, the evidence of that quote-unquote change came from Mr. Harrigan, the financial advisor who benefited from these trades, and I detailed in my brief that there were several credibility questions that arose with Mr. Harrigan. I'm not going to go through them now, but there is ample reason for a jury to suspect that Mr. Harrigan may have decided to encourage or induce Mr. Purcell to make these trades, not for Mr. Purcell's benefit, but to earn the commissions. Was Mr. Purcell, did he testify? No, and Judge, that's an excellent point because the jury might have concluded that the failure to call Mr. Purcell indicated that those plans never changed. USBI did not call him. I didn't call him because, frankly, Mr. Purcell's mental state would have rendered any of his testimony suspect anyway, but the jury may have concluded that if indeed he was this sound, experienced, competent investor that Pat Harrigan painted him as on the stand, why didn't USBI? Where is he? And they may have concluded that they didn't, that USBI didn't call him because they didn't want him to testify about misrepresentations or omissions that Mr. Harrigan may have made. Judge, the brief of the appellant also discusses its claim that Reinheimer failed to prove he had an objectively reasonable belief that USBI caused loss to Purcell, and I wanted to address that briefly. First and foremost, that's a misstatement of the law. Reinheimer did not need to prove that Purcell suffered loss. Under the Day v. Staples decision, a plaintiff need not show actual harm, but need only show that the whistleblower had an objectively reasonable belief that there were misrepresentations or omissions which risked harm, and that's the same language that this court used in that unpublished riddle decision that Judge Moore referred to previously. He only needed to have a reasonable belief that there was a risk of loss to Purcell. The defendant claims, USBI claims, that Mr. Purcell made $18,000 from these investments that Mr. Harrigan placed, and I would tell you that that's irrelevant. It's irrelevant because, first and foremost, he need not prove that there was actual loss, but secondly, and more importantly, we have to look at what Mr. Reinheimer reasonably believed at the time he wrote that complaint. What did he reasonably believe on May 28, 2010? Well, here's the information that's in the record as of May 26, 2010, two days before the email was written. This is now 23 days after Mr. Harrigan makes the first fund purchase for Purcell. The first fund is down $2,000. We're now 16 days after the second fund was purchased by Harrigan for Purcell. The second fund had lost about $19,000 in two weeks. So he's down over $21,000 as of the time Mike Reinheimer writes the email. Did Mike Reinheimer have a reasonable belief that there was a risk of loss here for Mr. Purcell? Of course. His reasonable belief wasn't just reasonable, it was accurate. At that point in time, he'd already lost money on these investments. But more importantly— The investment was the $900,000. Is that how much— Yes. The two investments together totaled $900,000. But more importantly, more importantly to Mike Reinheimer is what he references in his complaining email. Yes, he referenced that the trades were worthless and they cost a bunch of money to Mr. Purcell. But he says explicitly, these trades ruined this elderly investor's estate plan. And that's the problem with these trades. It took the $900,000 out of the trust and moved it into an account that was titled in Mr. Purcell's name individually so that it would pass through his will when Mr. Purcell died. And his charitable and educational beneficiaries would be deprived of $900,000 that he had always meant to give them. And his heirs would be enriched by $900,000 that he had never meant to give them. In sum, essentially USBI wants you to ignore the fact that Reinheimer's beliefs were proven correct here. It wants you to focus on the absence, on Reinheimer's absence from the meetings with Purcell. But accurate beliefs are by definition reasonable beliefs. USBI has failed to meet its burden, and we're asking that you maintain the jury's verdict. Thank you. Thank you. I wanted to raise five different points. The first is this claim that the client at issue is of diminished capacity. This goes back to a point I made earlier. The last day that the plaintiff saw the client in question is the day that he placed the only trade for this gentleman. He didn't talk to him after. The only time he placed a trade was when the client was his last day of work. It's the only time that he ever made a trade. That's not reasonable to claim that he didn't know what he was doing on October the 30th of 2009, and that's when he placed his trade for him. This claim that he'd been working with the client for 10 years, they sat there and chatted in the office. There's no question about that, but they hadn't been working together. Why was it that your client didn't bring Mr. Purcell in to testify at the trial? I'm not going to bring a client in. Would these clients come to us for help? We're not going to call them into a federal court trial. Why not if his financial affairs are at issue in the trial? I'm not going to call a client. That's aggravation for them, and that's a disincentive for them to come to work with our firm. Well, he knows the trial is going on and that his monies are being discussed there. It would seem that he wouldn't entirely object to seeing what's going on in the trial with his affairs. Your Honor, that was my decision, that I was not going to involve a client or the firm in this kind of a trial. All right. The next point, this claim that there was a conversation between Harrigan and Reinheimer not to trade in the client's account. Mr. Reinheimer pointed as evidence of this that there was a cell phone conversation between the two gentlemen in question. The cell phone records were produced. The cell phone records confirmed that there was no such conversation. Judge Daughtry, you asked about the commission, a point that I'm not sure was understood at trial. The commissions on these mutual funds are paid by the mutual fund company. The clients don't pay any of the commission. So it's different, I think, than a normal kind of circumstance when you're thinking about commission. Well, I wasn't insinuating that it came from the client. I just wanted to make sure. I know how it works. I've got a little bitty portfolio of my own. I really don't need to, you know. But somebody gained from it to wit Mr. Harrington. Yes, indeed. Harrigan. Yes, indeed, Your Honor. The last point I wanted to make, this claim that this gentleman's estate plan was ruined, that's not securities fraud. The source of the $900,000 had been in that trust for a minute. It was these two other matured instruments. And then when those instruments were matured, they went under the trust, yeah. Let me ask you one thing. You keep referring to this as securities fraud. The legal phrase that is at issue is unsuitability fraud, not securities fraud. Isn't that right? It's a subset of securities fraud. It's analyzed under the same principles. But, yes, you're right. It is unsuitability. Well, no, it's not under the 10b-5 and the securities fraud statutes and cases. This is a particular – there's a – in fact, there's a specific definition of unsuitability fraud that we have to follow here that's quite a bit different than the normal securities fraud, unless there's something I don't understand about all this. Well, no, I think you're right, Your Honor. But I believe, again, that unsuitability fraud is a subset of securities fraud. And that how these instruments were titled is not unsuitability fraud. The question is whether or not the investment was a suitable investment. And all this focus on the estate plan is a red herring. The plaintiff was upset that someone else got money that he didn't. He wrote this email without thinking about it. And the jury found that he got fired for it. But that's not a violation of Sarbane's office. I don't see anything under the definition of unsuitability fraud that equates with securities fraud. It has five elements. One, that the securities purchased were unsuited to the buyer's needs. Two, the defendant knew or reasonably believed the securities were unsuited to the buyer's needs. Three, that the defendant recommended or purchased the unsuitable securities for the buyer anyway. Four, that with Sienta, the defendant made material misrepresentations. Five, that the buyer justifiably relied to his detriment on the defendant's fraudulent conduct. To me, that doesn't have any ñ that's not the definition of securities fraud. Well, that's in our brief, those exact points. Again, it goes to this, where's that material misrepresentation? The plaintiff didn't know of a material misrepresentation. And the complaint that he made was not reasonable when he made it. I see your red light is on, so thank you very much. Thank you both for your argument. The case will be submitted.